## SUPREME COURT.

### JOHANNES OERTEL and GEORGE T. JAMES agt. HAMILTON WOOD, Jr.

*Literary property* exists in an *oil painting.* And the right to *reproduce literary creations,* is property at common law, irrespective of copyright statutes.

An artist has an exclusive right to reproduce copies of his own creation, and that right is susceptible of *assignment,* either in whole or in part.

If, therefore, the author of an oil painting has an exclusive property therein, and such property is susceptible of being shared by assignment with another person, then such exclusive property will be *protected by a court of equity* unless the same has been surrendered by dedication of the original painting to the public.

If A., as artist, composes a picture, and gives to B. only the right to *make copies,* C. has no right to claim that, in consequence of the transaction between A. and B., A.'s proprietary right has been lost, either by a dedication of the original painting to the public or otherwise.

The plaintiff Oertel, an artist, composed and painted a picture, called *"The Rock of Ages,"* and subsequently gave to his co-plaintiff, James, an exclusive right to reproduce such picture, as an engraving, chromo-lithograph, lithograph, or in any other manner, except that of a *fac-simile* oil painting; and James agreed to share with Oertel the profits to be derived from the sale of such reproductions.

*Held,* that the plaintiffs were entitled to an injunction, restraining the defendant from making and selling under the name of "The Rock of Ages" any reproduction of said oil painting in the form of a photograph thereof, he well knowing the premises and the exclusive right the plaintiff had in the said picture.

*New York Special Term, January,* 1870.

THIS suit was instituted to protect the plaintiffs' literary property in a picture in oil, painted by the plaintiff Oertel, and by him styled " The Rock of Ages," and to prevent the sale of photographic reproductions of such painting by the defendant. A preliminary injunction to restrain such sale, was granted by his honor Mr. Justice BARNARD.

The defendant demurred to the complaint for the alleged reason that the same did not state facts sufficient to constitute a cause of action. The defendant also moved, upon affidavits alleging that the original painting in oil had

been sold by the plaintiff Oertel, to dissolve the injunction. Such motion was opposed by affidavits denying the fact of such sale, and alleging the present possession by the plaintiff Oertel of the original picture.

Simultaneously with the motion to dissolve the injunction, the plaintiffs moved for judgment absolute on the ground of the frivolousness of the demurrer. Both motions were heard together by his honor Mr. Justice CARDOZO, who ordered final judgment for the plaintiffs, and denied the motion to dissolve the injunction.

DANIEL W. GILLETTE, *attorney, and*
CLARENCE A. SEWARD, *counsel for plaintiffs.*

*Facts admitted by the demurrer.*—The plaintiff Oertel is an artist. He composed and painted a picture intended to illustrate that particular portion of the Christian faith which affords the greatest comfort to its believers; and he borrowed from one of the most beautiful hymns that piety has produced, a name for the composition, viz.: "THE ROCK OF AGES.".

Subsequently, Oertel gave to his co-plaintiff, James, an exclusive right to reproduce such picture as an engraving, chromo-lithograph, lithograph, or in any other manner, except that of a *fac-simile* oil painting; and James agreed to share with Oertel the profits to be derived from the sale of such reproductions.

Subsequently, the plaintiff, James, caused to be made and published a chromo-lithograph and photograph, and is about to publish an engraving of said painting; and he has exposed for sale, and sold, and is now selling in the market, large quantities of the chromo-lithograph and photograph, under the name of "The Rock of Ages."

The defendant, well knowing the premises and the exclusive right of the plaintiffs in the said picture and in the aforesaid reproductions thereof, has been engaged in making

and selling, under the name of " The Rock of Ages," a re-production of said oil painting, in the form of a photograph thereof; and by means thereof he has diverted from the plaintiffs the sales of their chromo-lithographs and photo-graphs, which otherwise, and but for the acts of the de-fendant, they would have made.

I. The common law has always given to every parent an exclusive right to control the multiplication of his own offspring; in other words, to reproduce his own productions. An invasion of this right, in another aspect, has filled our reports with cases sounding in damages. An infraction of the rule in another regard has led to the exercise of the preventive remedies of the law, to arrest the palming off a spurious production as the manufacture of the original pro-ducer. The law protects ideal as well as physical property; and it grants its injunction to restrain an invasion of good-will, of trade-make, and of reputation.

The oldest human faith preserved and transmitted the command, "Thou shalt not steal;" and the injunction was preserved in a milder form in the Golden Rule, and, since time immemorial, has found voice through innumerable rules and maxims of the common law. This injunction forbids as well the unwarranted invasion or appropriation of an incorporeal right, as of a right to things which have a physical existence, and where there is a right *ibi remedium*.

II. The right to the exclusive reproduction of the crea-tions of one's intellect, which are known as literary crea-tions, is as well recognized, and as sharply defined by the common law, as the right of liberty or of reputation, or any of the sacred rights of home. Penal statutes authorized actions on the case, and swift and peremptory injunctions, alike attest the jealousy with which the law regards the illegal appropriation of any literary offspring. Things which have no physical existence, save in the absence of objection to their exercise, are as frequently vindicated by

Oertel agt. Wood.

the law as those which can be measured by the standard of money. The right of presentation to an advowson, the sale of the good-will of a trade, the sale of a news-stand, and the sale of a subscription list, are familiar illustrations of the rule. ( 6 *A. & D.*, 438; 5 *Bos. & Pul.*, 70; 6 *Bevan*, 275; 7 *Simons*, 421–4; 17 *Vesey*, 342.)

III.—The right to reproduce literary creations is property at common law, irrespective of copyright statutes; and, unless the author chooses to abandon it by dedicating it to the public, it is a perpetual right. "Literary property," as was well said by Mr. Booth, in the case known as *After Dark*, "is the right which an author and his assigns have to the exclusive and perpetual use and enjoyment of his literary productions, to which no independent right is or has been vested in another by any voluntary act of himself or his assigns."

The same idea found judicial utterance in the case of *Woolsey* agt. *Judd*, (4 *Duer*, 385,) through Mr. Justice DUER, who said: "There is probably no doctrine which is more fully sustained and, indeed, established by authority, than that the author of an unpublished manuscript has the exclusive right of property therein at common law—a right which entitles him to determine for himself whether the manuscript shall be published at all, and in all cases to forbid its publication by another. And it is equally certain, whenever this exclusive right is in danger of being violated, a court of equity is bound, upon the application of the author, to prevent the wrong by a perpetual injunction."

Nor has this common-law right been taken away or abridged by the statutes that have been passed for the protection of copyright, in the ordinary sense of the term. Its existence is prior to these statutes, and is independent of their provisions. *(Donaldson* agt. *Beckett*, 4 *Burr*, 2508 ; *Southey* agt. *Sherwood*, 2 *Merrivale*, 437 ; *Keene* agt. *Wheatley*, 23 *Law Reg.*, 440; *Roberts* agt. *Myers*, 23 *Law Reg.*, 396; *Boucicault* agt. *Wood*, 16 *Am. L. Reg.*, 539; *The Duke*

*of Queensbury* agt. *Shebbeare,* 2 *Eden,* 329 ; *Thompson* agt. *Stanhope, Amb.,* 337 ; *Pope* agt. *Keene,* 2 *Atk.,* 342 ; *Miller* agt. *Taylor,* 4 *Burr,* 2303 ; *Macklin* agt. *Richardson, Amb.,* 684 ; *Jeffreys* agt. *Boosey,* 4 *H. of L. Cas.,* 944.)

IV. If, therefore, the right of literary property can exist in an original painting, and such right is susceptible of assignment, and such painting has been reproduced by any of the means now known to the arts, without the sanction of the author of the painting, then the author-artist, and his co-plaintiff and assignee, have a right to enjoin the sale of such reproduction. In such case, the rule laid down by Lord ELDON, in *Southey* agt. *Sherwood (supra)*, is of absolute application, viz., that an injunction will be granted whenever it is necessary to prevent the unauthorized use of that which is the exclusive property of another. A court of equity does not in such case require further or other proof of irreparable damage before it will grant its preventive remedy.

V. Literary property does exist in an oil painting, both upon authority and upon original reason.

In *Woolsey* agt. *Judd (supra,)* the court said : "We can perceive no reason for doubting that the exclusive property of an author rests exactly upon the same ground as that of a manufacturer or artist. A painting may be a wretched daub, or a statue a lamentable abortion, yet should either be purloined by an enemy with a view to secure profit to himself, or to disgrace the artist by its public exhibition, a court of equity would renounce its principles should it refuse to protect the owner, the unfortunate artist, by a peremptory injunction." *A fortiori* is this true when the picture is not a daub, but one of the highest types of the excellence of art, and when the reproduction is not sought from vindictive motives, but for pecuniary gain.

Substantially the same doctrine—that property exists in pictures or prints—is asserted in the case of *Prince Albert* agt. *Strange ; Her Majesty's Attorney General* agt. *Strange,*

Oertel agt. Wood.

(2 *DeGex & Smales*, 652,) affirmed on appeal—(1 *McN. & G.*, 40,) and in *West* agt. *Francis*, (5 *B. & Ald.*, 737.)

The whole doctrine of literary property, as applicable to the productions of the intellect, and the imagination, in whatever form such productions may exist, was declared by LORD MANSFIELD, in the case of *Miller* agt. *Taylor*, to be "the right to multiply copies of such creation." This right appertains, at common law, to the author of anything which may be the product of the mind, worked out through the instrumentality of language, or that which is equivalent to language.

The author of an oil painting, or of a composition in oil colors, has the same right to claim the benefit of the law of literary property as the author of a book.

This is illustrated by a reference to the various modes of human utterance which the law has already taken under its protection, upon the ground of literary property. *(Private letters, Curtis on Copyright*, 89; *Oral lectures, Id.*, 103; *Dramatic compositions, Id.*, 103; *Books printed for private circulation, Id.*, 105; *Music unaccompanied by words, Id.*, 106, *et seq.; Periodical publications, Id.*, 109; *Hotel names, and proper names applied to productions of every kind, Merserole* agt. *Tynberg*, 36 *How.*, 14.)

It is true that an oil painting is not, strictly, a literary production, in the derivative sense of that term. But it only fails to be a literary production because its idea is not expressed in letters. But a composition in the form of an oil painting may be, and often is, gifted with the same voice as that which gives utterance from the printed page. Both alike instruct, and sadden, or amuse; and the result in either case is the idea which is conveyed through the eye to the brain, and there apprehended and appreciated.

An oil painting represents an idea in colors, giving to the idea, by reason of imagery or color, a clothing which, if the idea is expressed in words alone, is afforded solely by the imagination of the reader or hearer. Therefore, the

picture is a sign. There are signs in algebra; there are signs in telegraphy; and there are signs which are used by the mutes; and all alike are a language, and are, within the meaning of the rule relied upon, literary productions There are unuttered sounds which are as intelligbile as though uttered by a mighty voice. There is the sound of the " still, small voice;" and there is the sound which has been heard for centuries, and which was uttered by the " morning stars when they sang together for joy." If there are " tongues in trees, and books in running brooks, and sermons in stones," there is a language equally as well recognized, and as strongly voiced, in an oil painting which represents, simply by its color and its drawing, the landing of a Columbus or the death of a Webster.

Again, an oil painting is a *manuscript* as literally as if the artist or author had expressed the idea of its composition in appropriate words. Any reproduction of this manuscript in oil, without the assent of the author, is as much an infringement of his right of literary property, as it would be if the manuscript were printed in black letter ; and the appropriation of the name of the painting is forbidden by the well known and now finally settled law applicable to trade marks.

If, therefore, a painting or a statue is within the rule of law applicable to literary property, it follows, as a necessary conclusion, that the artist has an exclusive right to reproduce copies of his own creation.

VI. If an artist has an exclusive right to reproduce copies of his own creations, that right is susceptible of assignment, either in whole or in part.

It was said by Blackstone in his Commentaries, (2 *Bl. Com.*, 405, 406,) that " when a man, by the exertion of his rational powers, has produced an original work, he has clearly a right to dispose of that identical work as he pleases ; and any attempt to take it from him, or vary the disposition he has made of it, is an invasion of his right of property."

Oertel agt. Wood.

Citing this, the master of the rolls, in *Turner* agt. *Robinson*, (10 *Ir. Ch. Rep.*, 127,) says: "This right of property exists in pictures or prints as well as in other works of art, and may be assigned by the author or artist." And following out the same idea, Judge HOAR, of the supreme court of Massachusetts, said, in the case of *Davenport* agt *Pilgrim*, *(Mss.,)* "An author has at common law, a property in his unpublished works, which he may assign, and in the enjoyment of which, equity will protect his assignees as well as himself."

There is, therefore, a right under the common law, to divide this right of property by assignment, and therefore, we find that both in this country and in England, the rights of assignees to exclusive sales, have been protected by the court. *(Morris* agt. *Kelly,* 1 *J. & W.,* 461; *Webb* agt. *Rose,* 3 *Swans.,* 674; *Tonson* agt. *Walker, Id.,* 672; *Thompson* agt. *Stanhope, Amb.,* 737; *Keene* agt. *Wheatly,* 9 *Am. L. Reg.,* 33; *Keene* agt. *Clark,* 1 *Abb.,* 68.)

The artist in this case has given his co-plaintiff, as assignee, an exclusive right to reproduce the original painting, reserving to himself a pecuniary benefit from the sales of such reproductions. Such reservation constitutes them joint owners or tenants in common, and as such they have a joint interest, which authorizes them to unite as plaintiffs when the exclusive right has been invaded.

VII. If the author of an oil painting, has an exclusive property therein, and such exclusive property is susceptible of being shared by assignment with another person, then such exclusive property is to be protected by a court of equity, unless the same has been surrendered by dedication of the original painting to the public.

What constitutes an abandonment in this regard, has not unfrequently been the subject of judicial discussion and decision. If the ideas in which literary property is claimed are found in a play, then such play may be represented upon the stage without an injury to the literary right of

the author. *(Keene* agt. *Wheatley,* 23 *Law R.,* 440; *Roberts* agt.*Meyers, Id.,* 346; *Boucicault* agt. *Wood,* 16 *Am. Law Reg.,* 539; *Macklin* agt. *Richardson, Amb.,* 694; *Coleman* agt. *Walthen,* 5 *D. & E.,* 245; *Murray* agt. *Elleston,* 5 *Barn. & Ald.,* 657.)

If the ideas were in the form of manuscript copies, then the printing of such manuscript, and its private circulation would not be an abandonment of the literary right or dedication thereof to the public. *(Prince Albert* agt. *Strange,* 2 *De Gex & S.,* 692; *Bartlett* agt. *Crittenden,* 4 *McLean's R.,* 300; *Folsom* agt. *Welsh,* 2 *Story's R.,* 109; *Rex* agt. *Watson,* 2 *Starkie,* 106–130.)

Nor is the circulation of the manuscript from hand to hand, a dedication to the public, or an abandonment of the right. *(Paley's Case,* 2 *Vesey,* 23; *Abernethy* agt. *Hutchinson,* 1 *Hall & Tw.,* 28.)

Nor, if the ideas were conveyed in the form of an oral lecture, would the delivery thereof, by their author, be an abandonment or dedication to the public, nor would his permission to take copies confer a right to make therefrom and sell second copies. *(Bartlett* agt. *Crittenden,* 4 *McLean,* 300; *Same* agt. *Same,* 5 *Id.,* 32; *Jeffreys* agt. *Boosey,* 4 *H. of L. R.,* 965; *Wolsey* agt. *Judd,* 4 *Duer,* 494.)

The rule is, of necessity, more liberal in regard to a painting than it is in regard to a book.

The agreement set out in the complaint is, that Oertel, the artist, gives permission to his co-plaintiff, James, to use the said picture for such reasonable time as may be necessary to reproduce the same, either in an engraving, chromo-lithograph, lithograph, or in any other manner except that of a *fac-simile* oil painting. In consideration of this, the artist, Oertel, agrees that he will not permit any reproduction of said picture to be made. This leaves the title of the original painting in the plaintiff, Oertel, and vests his assignee with Oertel's common law literary right to produce reproductions of such oil painting, and permits

the use of the original painting for the purpose of such re-production. This agreement does not divest Oertel of his common law proprietary interest in the manuscript picture, and does give to James an exclusive right to do that which Oertel, but for such agreement, might himself have law-fully done, viz: to reproduce the original painting. Such use, by the co-plaintiff, James, of the original picture and the reproduction thereof, and the sales of such reproduc-tions by him, are not an abandonment of the exclusive common law proprietary right in the original picture by either the artist, Oertel, or his copartner, James. An original painting is, as has been said, like a manuscript. It is the original of all subsequent copies, and as nothing short of a sale of manuscript by the author of a book can, in the one case, divest him of his proprietary right, so on the other, nothing short of a sale of the original painting can divest the artist of his proprietary right therein. The manuscript, viz.: the original painting, may be circulated from hand to hand and enjoyed by thousands, without in-juring the proprietary right. Private copies of books and pictures may be made for private circulation, and still the prorietary right is uninjured. The manuscript may be spoken, and ten thousand as auditors may enjoy the knowledge of its contents, but still the proprietary right remains uninjured. The picture may be exhibited, and ten thousand may see it, and carry away its ideas, as they would carry away the ideas of a lecture, but the pro-prietary right still remains uninjured. Nothing short of an absolute sale of the manuscript, or of the original paint-ing, can deprive the authors thereof of their proprietary interest therein. Anything less than this is but an exercise of the right of exhibition, which the law permits to be made without injury to the right of absolute ownership. But the artist, in the present case, never parted with his title to, or interest in, his picture. He sold and assigned his right, which existed at the common law to multiply

copies thereof, reserving to himself a pecuniary interest in the sales of such copies.  This sale, within all the authorities, and within every principle of original reason, was not destructive of his common law proprietary right in the original painting; and as long as that remains unharmed, so long is an invasion of that right to be promptly redressed by a court of equity.  In the case of *Prince Albert* agt. *Strange*, already referred to, the subject matter of dispute, was the right of the defendant to publish *fac-similes* of sketches made by the Prince Consort and the Queen of England, and of which they had had copies made, and privately circulated the same among their friends.  Copies of such etchings had been surreptitiously obtained by the defendant (though not by his personal endeavor,) and he advertised copies of the same for sale, together with a catalogue descriptive of the subject of such etchings.  The master of the rolls, and subsequently the Lord Chancellor of England, restrained the reproduction of such etchings, and the publication of the descriptive catalogue, on the ground that the Prince Consort and Her Majesty had a proprietary right recognized by the common law in such etchings, and that such right was violated by a sale of *facsimiles* of the etchings, and of a catalogue descriptive of the subject thereof.  If the design of an etching, and the causing of the same to be engraved, and the giving away of copies thereof, do not injure the proprietary right in the original design, *a fortiori*, is not such proprietary right injured when the original designer says:  "I appoint you to make and sell copies of such design, and reserve to myself the right to participate in the pecuniary benefits thereof."  If A., as artist, composes a picture and gives to B. only the right to make copies, C. has no right to claim that in consequence of the transaction between A. and B., A's. proprietary right has been lost.

VIII. It was Burke who defined law to be the application of the principles of universal justice to the infinite

Oertel agt. Wood.

variety of human concerns. From time immemorial the infinite variety of human concerns has traveled in a circle. The wisest of men has asserted the fact that there was nothing new under the sun; and one, not less wise in his generation, has asserted that history repeats itself. There is hardly a possible complication of the infinite variety of human concerns which does not find its antetype preserved in the report of that which passes as a precedent. So in the present case. The case of *Turner* agt. *Robinson*, decided before the master of the rolls, in January, 1860, (10 *Ir. Ch. R.*, 121,) and affirmed by the Lord Chancellor and the Lord Justice, sitting as a court of appeal, *(Id.*, 510,) is parallel with the present case. In that case, one Wallis painted a picture which he called "The Death of Chatterton." It was exhibited at the Royal Academy, and by his permission, a wood engraving of it was published in the National Magazine. Wallis afterwards sold the picture to one Egg, for one hundred guineas, and Egg exhibited it for two years in the galleries of London and Manchester. Two years after such exhibition, Egg, by an agreement in writing, sold to one Turner, the right to engrave and publish an engraving of the picture, for the sum of £150; and Egg agreed to lend the picture to Turner for the purpose of engraving it, and for the further purpose of exhibiting the original picture, so as to procure subscriptions for the engraving thereof. Turner exhibited the picture, and published advertisements of his intended engraving. One Robinson saw the picture and he arranged in a garret, a pallet, a table and a box, and formed a back scene of a view of London painted on a canvas screen, and placed a person named Murray on the pallet, to represent Chatterton on his death bed, and he then took from the figure of Murray, with its surroundings, stereoscopic views, which he published and sold under the name of "The Death of Chatterton." An application was made to the master of the rolls, for an injunction. It was opposed upon the ground that

there was no common law right in a painting; and that if
such a right existed therein, Wallis had lost it, first, by the
exhibition of the picture, and by authorizing the wood-cut,
and secondly by the sale to Egg ; or that if it passed from
Wallis to Egg by the sale, it had been lost by Turner, by
virtue of his having made or being about to make an en-
graving of the picture for public sale; and lastly, upon the
ground that a stereoscopic representation of that which ac-
tually existed in front of the stereoscope, at the time the
stereoscopic view was taken, was not an infringement of
the common law right in the picture.    These several
grounds were overruled *seriatim*—first by the master of the
rolls, and finally by the high court of chancery on appeal;
and the injunction was made perpetual.

But the objection that, because there is no copyright
under the statutes, there is no right to restrain a piracy,
has been even more emphatically decided in other cases.

In *Mayhew* agt. *Maxwell*, (1 *Johns. & Henn.*, 312,) the
plaintiff had been employed by the proprietor of a monthly
periodical called the " *Welcome Guest*," to compose an
article for publication in that magazine.    He composed
such article under the name of " The Fifth Ring—*Mr.
Odonto Redstart in search of a Wife.*"    The defendants were
the present proprietors and publishers of the magazine, and
advertised a re-publication of the plaintiff's article.    The
plaintiff moved for an injunction, and the defendants " took
the preliminary objection, that the tale was not registered
at Stationer's Hall, and that the plaintiff had no right to
take any proceedings for breach of copyright."    Vice
Chancellor WOOD, in deciding the case said that notwith-
standing the right of the proprietor of the magazine
in the article written by the plaintiff, the plaintiff, " re-
tained the right to protect his future interests by pre-
venting a separate publication without his consent;" and
that the proceeding to obtain an injunction was not a
proceeding in respect of any infringement of copyright,

Oertel agt. Wood.

and he granted an injunction against the publication by the defendants.

This decision recognized, *first*, the literary property of an author in his works ; *second*, that such property was not lost by publication in a magazine ; and *third*, that registration (which is equivalent to the American copyright) was not an essential prerequisite to protection.

In the case of *Cox* agt. *Land and Water Journal Co.*, *(Law Rep.* 9, *Eq. Cas.*, 324,) the plaintiff was the proprietor of a newspaper called " *The Field.*" He pulished therein an article entitled " The List of Hounds." The defendants were the publishers of a newspaper known as " *The Land and Water Journal,*" in which they published an article entitled " The Hunting Field of 1870," which contained in it the substance of the article entitled " The List of Hounds." The plaintiff moved for an injunction to restrain the sale of the article called " The Hunting Field of 1870." A preliminary objection was raised by the defendants, that the plaintiff's newspaper was not registered under the copyright act, and consequently that the plaintiff had no copyright upon which he could sue so as to restrain a piracy. Vice Chancellor MALLINS said : " The preliminary objection taken in this case, raises a point of vast importance to the proprietors of newspapers and to the public at large. * * * If the contention of the defendants is right, the paper which copied might say : ' But they,' the articles, ' are common property. I admit you have given a great deal of money for them, and they are so very valuable that I desire to turn them to account by publishing them in my newspaper. But you have no property in them (although you pay for them;) you cannot sue for your newspaper as a book, for then the copyright must be registered ; and as you have not registered the book, nothing in the newspaper is protected.' If that is the law, it is a monstrous state of law, repugnant to common sense and common honesty, because, that there is a property in those

Oertel agt. Wood.

articles, there can be no shadow of doubt. I am of opinion that the preliminary objection taken by the defendants must be overruled."

The analogy between the cases of *Turner* agt. *Robinson, Mayhew* agt. *Maxwell, and Cox* agt. *Land, &c. Co.,* and the present is complete; and the law which authorized and sanctioned the injunctions in those cases, should also authorize and sanction an injuntion in the present case.

IX. The making of a copy of a picture by the process of photography is an infringement. *(Graves* agt. *Ashford, Eng. Law Rep.,* 2 *C. P.,* 410.) If the infringing photograph be itself a copy from an authorized photograph. then it is a fraud in itself, and it is to be enjoined upon the same principle as the unauthorized reproduction of the original, or as the sale of copies of an oral lecture by the student who heard it.

X. The order appealed from should be affirmed.

GEORGE W. WINGATE, *attorney and counsel for defendant.*

CARDOZO, J.—This case cannot be distinguished in principle from the cases of *Prince Albert* agt. *Strange,* (2 *De G. & Sm.,* 652,) and *Turner* agt. *Robinson,* (10 *Ir. Ch.,* 510.) Perhaps the injunction is too broad, but that can be remedied. The motion to dissolve must be denied.

Ordinarily the question like that presented here, should not be passed upon on a motion to overrule a demurrer as frivolous, but when it has been fully argued, it may as well be disposed of on the merits as not, especially when those merits are really involved in the motion to dissolve the injunction.

The motion of the plaintiffs for judgment, is therefore, granted.